# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

**CECIL BEALS (#211347)**                         **CIVIL ACTION NO.**

**VERSUS**                                        **20-579-BAJ-EWD**

**DARREL VANNOY, et al.**

## <u>NOTICE</u>

Please take notice that the attached Magistrate Judge's Report has been filed with the Clerk of the U. S. District Court.

In accordance with 28 U.S.C. § 636(b)(1), you have 14 days after being served with the attached report to file written objections to the proposed findings of fact, conclusions of law, and recommendations set forth therein. Failure to file written objections to the proposed findings, conclusions and recommendations within 14 days after being served will bar you, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Court.

**ABSOLUTELY NO EXTENSION OF TIME SHALL BE GRANTED TO FILE WRITTEN OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT.**

Signed in Baton Rouge, Louisiana, on July 27, 2023.

**ERIN WILDER-DOOMES**
**UNITED STATES MAGISTRATE JUDGE**

## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

CECIL BEALS (#211347)                          CIVIL ACTION NO.

VERSUS                                         20-579-BAJ-EWD

DARREL VANNOY, et al.

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Before the Court is a Petition for Relief from a Conviction or Sentence By a Person in State Custody (Petition Under 28 U.S.C. § 2254 for a Writ of Habeas Corpus) ("Petition"), filed by Cecil Beals ("Beals"), who is representing himself and who is confined at the Louisiana State Penitentiary in Angola, Louisiana.[1] In his Petition, Beals argues three grounds for relief, all alleging ineffective assistance of counsel during trial in violation of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.[2] Darrel Vannoy and the District Attorney for the Twenty-Third Judicial District Court, Parish of Ascension, State of Louisiana (collectively, "Respondents") filed an Answer and Memorandum in support.[3] Beals filed a Reply to Respondents' Answer.[4] As Beals has not shown that the state courts' adjudication of any of his claims either "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding,"[5] it is recommended that Beals's Petition be denied. There is no need for oral argument or for an evidentiary hearing.

---

[1] R. Doc. 1.
[2] R. Docs. 1, 1-2.
[3] R. Docs. 9, 10.
[4] R. Doc. 13.
[5] 28 U.S.C. §2254(d).

### I.    PROCEDURAL HISTORY AND FACTUAL BACKGROUND

Beals was indicted by a grand jury on May 15, 2013 for one count of the second degree murder of Gerald Wilkins ("Wilkins") in violation of La. R.S. 14:30.1.[6] Beals was found guilty of second degree murder by unanimous verdict on May 20, 2014 following a jury trial.[7] He was sentenced on July 14, 2014 to life imprisonment, at hard labor, without benefit of parole, probation, or suspension of sentence.[8] Beals sought a direct appeal with the Louisiana First Circuit Court of Appeal ("First Circuit"), which affirmed his conviction and sentence on July 7, 2016.[9] The Louisiana Supreme Court subsequently denied writs of supervisory review on June 5, 2017.[10]

On or about August 1, 2018, Beals filed an uncounseled application for post-conviction relief ("PCR application").[11] The trial court denied Beals's PCR application on March 26, 2019.[12] Beals then sought review with the First Circuit, which was denied on July 22, 2019.[13] The Louisiana Supreme Court similarly denied writs on July 31, 2020.[14] This Petition followed.

The factual background, as stated by the First Circuit, is as follows:[15]

On Saturday, January 12, 2013, between 3:30 and 4:00 a.m., Marvin Joe Mayers, who lived on Panama Road in Sorrento, Louisiana, was walking his dog when he heard gunshots and then saw a silver or gray vehicle, with a spoiler on the back and a stripe down the side, speed down the road. He told his girlfriend what he saw and heard before leaving for work that morning. Subsequently, Shawn Dunbar, a driver in the area traveling from Panama Road to LV Road discovered a body, later identified as victim, Gerald G. Wilkins, on the side of the road in a wooded area. Mr. Dunbar immediately reported his discovery to a 911 dispatcher and a nearby resident. At approximately 8:00 a.m., officers of the Ascension Parish Sheriff's Office (APSO) were dispatched to the wooded area on LV Road. Deputy Chris

---

[6] R. Doc. 11-1, pp. 65-67.
[7] R. Doc. 11-4, pp. 66-68, 79. Beals was tried with co-defendants Darryl Jones and Calvin Williams.
[8] R. Doc. 11-4, p. 80.
[9] R. Doc. 11-6, pp. 63-88; *see also State v. Beals*, No. 2015-87 (La.App. 1 Cir. 7/7/2016), 2016 WL 3655368.
[10] R. Doc. 11-5, p. 249; *see also State v. Beals*, No. 2016-1525 (La. 6/5/2017), 219 So.3d 339 (Mem.).
[11] R. Doc. 1-3, pp. 15-44, including memorandum in support.
[12] *Id.*, pp. 6-13.
[13] *Id.*, p. 5; *see also State v. Beals*, No. 2019-570 (La.App. 1 Cir. 7/22/2019), 2019 WL 3285263.
[14] *Id.*, pp. 2-3; *see also State v. Beals*, No. 2019-1517 (La. 7/31/2020), 300 So.3d 386 (Mem.).
[15] R. Doc. 11-6, pp. 64-66; *State v. Beals*, 2016 WL 3655368, at **1-2. The Court notes that in the trial transcript Joe Meyers's name is spelled as "Mayers." Both Mayers and Meyers refer to the same person.

Williams arrived at approximately 8:04 a.m. and noted that it was foggy with low visibility in the area. He secured the scene, called the APSO criminal investigation division (CID), and took statements from Mr. Dunbar and other potential witnesses. Deputy Williams learned that shots had been fired during the early morning hours. When found, the victim's body was positioned face down, partially in the roadside ditch, and partially on the roadway.

APSO CID personnel arrived at the scene at approximately 8:30 a.m. and took photographs. Lieutenant Gerald Whealton, an APSO crime scene investigator, noted that the victim's hands were not scuffed or injured, his shirt was not torn or dirty, nor were his clothes disheveled; thus, Lt. Whealton concluded that the victim had not been involved in a struggle. Lt. Whealton further noted that, while the ground was wet from recent rainstorms, and filthy with dirt and debris that was blown around the area, the victim's shoes were relatively dirt and debris free, indicating that he did not walk to the location where he was found. When the victim's body was turned over, the officers discovered a suspected crack pipe in his left hand, noting that a push rod and a lighter were still clenched in his hand. Additionally, the victim's pants' zipper was down, his genitals were exposed, and the front of his pants were wet, indicating that he was urinating at the time of his murder. The victim was not found with a cell phone, wallet, or any form of identification. The victim's fingerprints were collected and taken to the Louisiana State Police Crime Lab, and the victim was later identified.

Lt. Whealton observed a bullet exit wound to the upper left back area of the victim's head and a bullet entry wound to the lower center back of his head. He noted that the entry wound bled to the left side of the victim's body, over his left shoulder, with a strong stream from the back of the head that decreased down to his neck and dribbled down the left side of his head, suggesting that the victim was on the ground at the time of the shot. He observed a second bullet entry wound behind the victim's right ear, which exited through the victim's forehead. Lt. Whealton noted that the pattern of the blood drippings for this injury suggested that the victim was on the ground at the time of this shot also. He estimated that the bullet recovered from the ground was either a .38 caliber or a 9mm and noted that there were no shell casings found at the scene, indicating that a revolver was probably used in the shooting. Ty Gautreau of the Ascension Parish Coroner's Officer pronounced the victim dead when he arrived at the scene. The victim's death certificate was later issued, indicating that the cause of death was gunshot wounds to the head.

During their investigation, the police identified three individuals, defendant Beals, Mr. Jones, and Mr. Williams, who became suspects in the victim's murder. The victim, Mr. Jones, Mr. Williams, and defendant Beals, who lived in Mr. Jones' garage, regularly met up at Mr. Jones' house, and they were all there the day and evening before the murder. Marvin McGee, an associate of the codefendants who was also at Mr. Jones' house that day, and who spent the night there, testified that between 10:30 and 11:00 p.m., he noticed that Mr. Jones' vehicle was gone. Mr. McGee also testified that he loaned Mr. Williams one of the two cell phones that

he had that night and that Mr. Jones' vehicle was gone at some point after he gave Mr. Williams the phone.

Mr. Jones' vehicle, a silver 2000 Chevrolet Impala, matched the description provided by Mr. Mayers, the Sorrento resident who heard the gunshots and saw a vehicle speeding down Panama Road. Records for the cell phone that Mr. Williams had that night showed that the cell phone was initially used in Baton Rouge, was used in Sorrento around the time of the murder, and was then taken back to Baton Rouge. In addition to these cell phone records, surveillance video from a convenience store located 1.4 miles from the murder scene showed that, at 3:38 a.m., defendant Beals exited Mr. Jones' vehicle and entered the store, and an unidentified driver pulled the car around. There appeared to be a passenger in the back seat of the vehicle.

State witness Jeremiah Billingsley knew defendant Beals and Mr. Jones and testified that, while he and defendant Beals were incarcerated together, defendant Beals disclosed the facts surrounding the murder. Specifically, defendant Beals told Mr. Billingsley that, before the murder, the victim had stolen from Mr. Jones multiple times. Defendant Beals offered to "take care" of the victim when he first began stealing from Mr. Jones, but Mr. Jones made it clear that the victim was not to be touched. Mr. Billingsley further testified that defendant Beals told him that, as the victim continued to steal from Mr. Jones, "they" took the victim to Sorrento, and when the victim got out of the car to urinate, "that's when he was taken care of."

## II.    LAW & ANALYSIS

### A.  Beals's Petition is Timely and All Claims Have Been Exhausted

While neither of these issues are raised by Respondents in their briefing, the Court turns first to whether Beals's Petition is timely and whether the claims have been exhausted in state court. As to timeliness, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") provides that a petitioner may file a habeas petition within one year of "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review."[16] Beals filed his direct appeal on April 27, 2015.[17] The First Circuit denied writs on July 7, 2016, with the Supreme Court following suit on June 5, 2017.[18] Because Beals did not

---

[16] *Causey v. Cain*, 450 F.3d 601, 603 (5th Cir. 2006), quoting 28 U.S.C. § 2244(d)(1)(A).
[17] R. Doc. 11-6, pp. 3-27.
[18] R. Doc. 11-6, pp. 63-88; R. Doc. 11-5, p. 249.

file an appeal with the United States Supreme Court, his conviction and sentence became final on

September 4, 2017.[19]  330 days later, on August 1, 2018, Beals filed his PCR application in the

trial court.[20]  The trial court subsequently issued an order denying the PCR application, after which

the First Circuit denied writs on July 22, 2019.[21]  The Supreme Court similarly denied writs on

July 31, 2020.[22]  Beals filed his Petition in this Court on September 1, 2020, 32 days later.[23]  As

only a total of 362 untolled days passed before Beals filed his Petition, his habeas claims in this

Court are timely.

Another threshold requirement for a habeas petition is that, subject to certain exceptions,

the petitioner must have first exhausted all of his claims in state court before raising them in the

federal district court.[24]  The exhaustion requirement is met when the substance of the federal

habeas claims has been fairly presented to the highest state court.[25]  Beals raised all three of the

claims presented here in his PCR application filed in the trial court.[26]  Upon denial of his PCR

application by the trial court, Beals sought writs of review with the First Circuit, which were

denied.[27]  The Louisiana Supreme Court denied Beals's subsequent writ application, stating that

"Applicant fails to show that he received ineffective assistance of counsel under the standard of

*Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)."[28]  As Beals

---

[19] *Roberts v. Cockrell*, 319 F.3d 690, 694 (5th Cir. 2003) (a conviction becomes final upon "expiration of the ninety-day period to seek further review with the Supreme Court").
[20] R. Doc. 1-3, pp. 15-44.
[21] *Id.*, pp. 5, 6-13.
[22] *Id.*, pp. 2-3.
[23] R. Doc. 1, p. 10.
[24] 28 U.S.C. § 2254(b)(1)(A) ("An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that ... the applicant has exhausted the remedies available in the courts of the State....")
[25] *Fisher v. Tex.*, 169 F.3d 295, 302 (5th Cir. 1999), citing *Whitehead v. Johnson*, 157 F.3d 384, 387 (5th Cir. 1998).
[26] R. Doc. 1-3, pp. 15-44.
[27] *Id.*, p. 5.
[28] *Id.*, pp. 2, 3.

previously presented all claims raised in the instant Petition to the highest court of the state, he has sufficiently exhausted all of his claims, such that the merits of each claim will be addressed.

### B.  The Claims Raised in the Petition Are Without Merit

#### 1.  Standard of Review[29]

Under 28 U.S.C. § 2254(d), an application for a writ of habeas corpus shall not be granted with respect to any claim that a state court has adjudicated on the merits unless the adjudication has "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[30]  Relief is authorized if a state court arrived at a conclusion contrary to that reached by the Supreme Court on a question of law or if the state court decided a case differently than the Supreme Court on materially indistinguishable facts.[31]  Relief is also available if the state court has identified the correct legal principle but has unreasonably applied that principle to the facts of the petitioner's case or has reached a decision based on an unreasonable factual determination.[32]  Mere error by the state court or this Court's mere disagreement with the state court determination is not enough; the standard is one of objective reasonableness.[33]  State court determinations of underlying factual issues are presumed to be correct, and the petitioner has the burden to rebut that presumption with clear and convincing evidence.[34]

---

[29] AEDPA overhauled federal habeas corpus legislation, including 28 U.S.C. § 2254.
[30] 28 U.S.C. § 2254(d).
[31] *Williams v. Taylor*, 529 U.S. 362, 413 (2000).
[32] *See Montoya v. Johnson*, 226 F.3d 399, 404 (5th Cir. 2000).
[33] *Id.  See also Williams*, 529 U.S. at 409 ("[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable").
[34] 28 U.S.C. § 2254(e)(1).

## 2. Ineffective Assistance of Counsel[35]

In his Petition, Beals brings three claims, all arguing ineffective assistance of counsel at trial.    Under *Strickland v. Washington*,[36] a habeas petitioner who claims that his counsel was ineffective must show the following: (1) that his counsel's performance was "deficient", *i.e.*, that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment; and (2) that the deficient performance prejudiced his defense, *i.e.*, that counsel's errors were so serious as to deprive the defendant of a fair trial in which the result is reliable.[37]    The petitioner must make both showings to obtain habeas relief based on alleged ineffective assistance of counsel.[38]

To satisfy the deficiency prong of the *Strickland* standard, the petitioner must demonstrate that his counsel's representation fell below an objective standard of reasonableness as measured by prevailing professional standards.[39]    The reviewing court must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional competence or that, under the circumstances, the challenged action might be considered sound trial strategy.[40]    This Court, therefore, must make every effort to eliminate the distorting effects of hindsight and to evaluate the conduct from counsel's perspective at the time of trial.[41]    Great deference is given to counsel's exercise of professional judgment.[42]

Even if the petitioner satisfies the first prong of the *Strickland* test, his petition must still demonstrate prejudice resulting from the alleged errors.[43]    It is not sufficient for the petitioner to

---

[35] R. Doc. 1-2, pp. 5-25.  *See* R. Doc. 11-6, pp. 96, 107-118.
[36] 466 U.S. 668, 687 (1984).
[37] *Strickland*, 466 U.S. at 687.
[38] *Id*.
[39] *Martin v. McCotter*, 796 F.2d 813, 816 (5th Cir. 1986).
[40] *Bridge v. Lynaugh*, 838 F.2d 770, 773 (5th Cir. 1988).
[41] *Martin*, 796 F.2d at 817.
[42] *Bridge*, 838 F.2d at 773; *Martin*, 796 F.2d at 816.
[43] *Earvin v. Lynaugh*, 860 F.2d 623, 627 (5th Cir. 1988).

show that the alleged errors had some conceivable effect on the outcome of the proceeding.[44] Rather, the petitioner must show a reasonable probability that, but for counsel's alleged errors, the result of the proceeding would have been different.[45]  The habeas petitioner need not show that his counsel's alleged errors "more likely than not" altered the outcome of the case; he must instead show a probability that the errors are "sufficient to undermine confidence in the outcome."[46] A habeas petitioner must "affirmatively prove," not just allege prejudice.[47]  Both the *Strickland* standard for ineffective assistance of counsel and the standard for federal habeas review of state court decisions under 28 U.S.C. § 2254(d)(1) are highly deferential, and when the two apply together, the review by federal courts is "doubly deferential."[48]

### a.  Claim One: Ineffective Assistance of Counsel in Failing to Refute Identification of the Vehicle Involved in the Homicide[49]

Petitioner first asserts that his trial counsel was ineffective by failing to investigate the daytime running lights of co-defendant Darryl Jones's vehicle.  As testified by Joe Meyers ("Meyers") at trial, he witnessed a car passing by shortly after he heard three gunshots, stating: "And I seen the car come speeding past me with his lights off and when he got to the next house down he turned his lights on and sped on down the road."[50]  Beals claims that he "informed investigators that the vehicle in his possession [Jones's vehicle] was equipped with daytime running lights that illuminate anytime the vehicle is running, regardless of switch position."[51]  The court, during trial, ordered the State to allow defense counsel to inspect Jones's vehicle.[52]  None

---

[44] *Strickland*, 466 U.S. at 693.
[45] *Martin*, 796 F.2d at 816.
[46] *Id*. at 816-17.
[47] *Day v. Quarterman*, 566 F.3d 527, 536 (5th Cir. 2009), citing *Strickland*, 466 U.S. at 693.
[48] *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009).
[49] R. Doc. 1-2, pp. 6-13.
[50] R. Doc. 11-1, p. 239.
[51] R. Doc. 1-2, p. 7.
[52] *Id*.

of the attorneys representing Beals or the other two defendants inspected the vehicle.[53]  As argued by Beals, the testimony by Meyers "was instrumental in linking [him] to the crime scene" and although "counsel had the opportunity to establish through testing that the defendant's vehicle could not have been the vehicle observed leaving the crime scene," he failed to do so.[54] Per Beals, "[t]he additional information concerning the lights would have proven Mr. Jones' vehicle could not have been the homicide vehicle."[55]

In reviewing this claim in Beals's PCR application, the trial court found that "Mr. Beals has not carried his burden in showing that there was the failure of his counsel to investigate this case nor has he shown that the decision not to investigate the vehicle was unreasonable."[56]  Thus, "this contention that his counsel was ineffective … is without merit."[57]  As reasoned by the trial court, "none of the three (3) of his counsel felt it necessary to investigate the vehicle."[58]  The trial court concluded that, based on the evidence presented at trial, Beals's counsel's failure to investigate the lights on the vehicle did not fall below the objective standard of reasonableness and did not prejudice Beals when taking the evidence presented as a whole.[59]  The trial court also found that, "as was shown throughout the evidence submitted by Mr. Beals, there was cross examination conducted regarding the identification of the vehicle by the witness in which counsel for Mr. Beals demonstrated the inconsistencies in the witness's prior testimony following the murder and his testimony at trial."[60]

---

[53] *Id.*; R. Doc. 11-3, pp. 37-38.
[54] R. Doc. 1-2, p. 8.
[55] *Id.*, p. 11.
[56] R. Doc. 1-3, p. 9.
[57] *Id.*, p. 10.
[58] *Id.*, p. 9.
[59] *Id.*
[60] *Id.*

Counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.[61]  In any ineffectiveness of counsel case, a particular decision not to investigate must be directly assessed for reasonableness considering all the circumstances, applying a heavy measure of deference to counsel's judgments.[62]  Given this standard and recognizing the "double deference" owed the trial court in its assessment of Beals's claim, Beals has not shown that the trial court reached a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, nor did it render a decision based on an unreasonable determination of the facts in light of the evidence presented on the issue of whether his counsel's performance was deficient.

Beals's trial counsel elicited testimony from Meyers concerning not only how his initial description of the vehicle he saw drive past did not exactly match Jones's vehicle, but also how his description of the vehicle changed from his statement to law enforcement the day of the murder to his testimony during trial.[63]  Counsel also highlighted for the jury in closing arguments that Meyers description of the vehicle was faulty.[64] Thus, it is clear from the questioning that counsel was aware of, and attempted to highlight through questioning and in closing, the possibility that the vehicle described by Meyers was not the vehicle in Beals's possession on the day of Wilkins' murder. Beals has not shown how counsel's alleged failure to investigate the differences in the vehicle running lights was deficient at all,[65] much less that the trial court's decision rejecting Beals's claim that counsel's performance was deficient was contrary to, or an unreasonable

---

[61] *Strickland*, 466 U.S. at 691.
[62] *Id.*
[63] R. Doc. 11-1, pp. 246-248.
[64] R. Doc. 11-3, pp. 244-245 (noting that Meyers testimony that the car he saw was not a sedan, but Jones's vehicle was a Chevy Impala, which is a sedan).
[65] The prejudice prong for each claim will be addressed together, below.

application of, clearly established federal law, or based on an unreasonable determination of the facts considering the evidence presented. As such, this claim should be denied.

> **b.** **Claim Two: Ineffective Assistance of Counsel in Failing to Call Rebuttal Witness to Contradict Witness Testimony** [66]

Beals's second claim is that his trial counsel was ineffective for failing to call Tony Wilson ("Wilson") as a rebuttal witness to testimony given at trial by Meyers. As alleged by Beals, prior to law enforcement interviewing him, Meyers spoke with his neighbor, Wilson, "and described the car that he had seen leaving the scene immediately after hearing shots fired."[67] Per Beals, the testimony of Meyers changed between the time he gave his initial statement to law enforcement and when he testified at Beals's trial.[68] While Beals acknowledges that his counsel challenged Meyers' description of the car at trial, calling attention to the discrepancies, he takes issue with the fact that counsel did not show how Meyers' testimony changed from the initial description he gave to Wilson.[69] As alleged by Beals, Wilson told investigators that Meyers described the car he saw as a small silver car with a "big scoop" on the hood and a "diamond shaped" design down the side of the vehicle.[70] Beals claims Wilson further described it as a vehicle that both Meyers and Wilson were familiar with from seeing it in the neighborhood.[71] Thus, Beals argues that his counsel "should have interviewed and/or requested an instanter subpoena for Mr. Wilson to impeach Mr. Meyers' credibility with his initial description and statements to Mr. Wilson."[72]

As determined by the trial court, "this contention made by Mr. Beals lacks merit" because:[73]

---

[66] R. Doc. 1-2, pp. 13-18.
[67] *Id.*, p. 14.
[68] *Id.*, p. 13.
[69] *Id.*, pp. 15, 17.
[70] *Id.*, p. 16.
[71] *Id.*, p. 17.
[72] *Id.*
[73] R. Doc. 1-3, p. 10

> While [Beals] argues that there was a failure to investigate Mr. Wilson as a potential witness, it appears from the evidence submitted in the police report that Mr. Wilson merely stated that Mr. Meyers gave him a description of the vehicle and that Mr. Wilson did not know Mr. Meyers personally. After reviewing the transcript of the cross examination of Mr. Meyers conducted by Mr. Beals' defense counsel, defense counsel conducted a thorough cross examination of Mr. Meyers impeaching him on the inconsistencies of his prior statements to investigators against his testimony presented at trial.

As assessed by the court, "the only information that Mr. Wilson was able to give police was that Mr. Meyers described the vehicle."[74] After again noting that Beals's counsel "clearly showed the inconsistencies of Mr. Meyers' testimony from his original interview to his testimony at trial," the trial court found that "it is clear that [Beals's] counsel conducted thorough cross examination impeaching Mr. Meyers on his testimony and Mr. Beals has failed to show that any further information gleamed from Mr. Wilson would substantially increase the likelihood of a different result at trial."[75]

Complaints of uncalled witnesses are not favored, not only because the presentation of testimonial evidence is a matter of trial strategy but also because allegations of what a witness would have testified are largely speculative.[76] The presentation of witness testimony is essentially strategy and, as such, within the trial counsel's domain.[77] A petitioner must overcome a strong presumption that his counsel's decision in not calling a particular witness was a strategic one.[78] However, the decision to interview a potential witness is not related to strategy and, instead, is a decision related to adequate preparation for trial.[79] Counsel has "a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations

---

[74] *Id.*
[75] *Id.*, p. 10-11.
[76] *Page v. Quarterman*, No. 06-625, 2007 WL 998473, at *11 (S.D. Tex. Mar. 30, 2007), quoting *Coble v. Dretke*, 444 F.3d 345, 350 (5th Cir. 2006).
[77] *Clark v. U.S.*, No. 09-387, 2012 WL 3580687, at *5 (E.D. Tex. Aug. 17, 2012), citing *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985).
[78] *Id.*, citing *Murray v. Maggio, Jr.*, 736 F.2d 279, 282 (5th Cir. 1984).
[79] *Chambers v. Armontrout*, 907 F.2d 825, 828 (8th Cir. 1990).

unnecessary."[80]  Thus, the question is whether counsel's decision not to interview Wilson was reasonable from counsel's perspective at the time that decision was made.[81]

The record evidence here supports the trial court's findings that the inconsistencies in Meyers' description of the vehicle, as he recounted it to Wilson, were pointed out at trial.  Detective Sullivan ("Det. Sullivan"), the lead detective on the case, explained the information provided by Wilson, as follows:[82]

Q.    Did you also interview a man named Tony Wilson that day?

A.    Yes.

Q.    Do you happen to recall that interview?

A.    I do.

**\*\*\*\***

Q.    …. So he said small, silver car with a big scoop on the hood, right?

A.    Right.  He said that's what he got from the witness.  He didn't see that. Tony did not see that.  Tony got that information from the witness.  He said he was walking his dog when he saw that vehicle.

Q.    Tony was walking his dog when he heard shots, right?

A.    No, Tony said that that's what the witness told him.

Q.    And there was a witness that said that there were several black males in the car?  He said that?  Right underneath that one about the silver hood, scoop on the hood.  Did he say that there were several black males in the car?

A.    Yes, that's what Tony said.

Thus, counsel elicited testimony from Det. Sullivan revealing Wilson's recollection of Meyers' description of the car he had seen.

---

[80] *Id.*, citing *Strickland*, 466 U.S. at 691.
[81] *See id.*
[82] R. Doc. 11-3, pp. 155-156. Although Beals argues that "[c]ounsel attempted to introduce Mr. Wilson's statements through Detective Sullivan, only to be met with a hearsay objection," a review of the trial transcript shows that Det. Sullivan testified about what Wilson told her about Meyers' description of the vehicle without objection.

Additionally, as stated above, counsel challenged Meyers' testimony at trial, calling attention to discrepancies in Meyers' description of the vehicle from his initial interview to his trial testimony. During cross-examination, Beals's counsel elicited the following testimony from Meyers[83]:

Q.    …. You see that question, it says, was it a sporty car?

A.    Yes, sir.

Q.    And what did you say?

A.    In other words, it wasn't like a Mustang or Camaro. Yeah, yeah, nothing like that. Yeah, nothing like that. It wasn't like a family sedan? No.

Q.    So you said it wasn't a family sedan, right?

A.    Correct.

Q.    So to you what is a sedan?

A.    A sedan is like a, I guess, a Lexus or something like that.

Q.    A car with four doors?

A.    Car with four doors maybe.

Q.    And you also talked about a stripe, remember?

A.    That's correct.

Q.    And when you were asked a question, the question was did the stripe go down the complete length of the car; what did you say, if you can recall?

A.    I can't recall.

Q.    Can I show you a statement [initially made by Meyers to law enforcement] again?

A.    Okay.

Q.    And maybe that could help refresh your memory.

---

[83] R. Doc. 11-1, pp. 246-48.

A.      It says, no, I didn't.  More than one stripe?  Yeah, it was like a section of stripes.

Q.      Go further down when they ask you did the stripe go all the way down the car.

A.      Just on the door area and that why I think that maybe it was two door because I seen the design there, and there, you know, it kind of stopped, but the door was long.

Q.      Okay.  Now, and you also testified on direct exam that the State – that the car that you saw had square tail lights, right?

A.      Correct.

Q.      I'm going to show you a picture of State Exhibit 19 [Jones's vehicle] that you previously said looks like the car that you saw that night.  Do you see square tail lights or do you see round tail lights on this picture?

A.      It looks – they don't look square or round.  They look –

Q.      What about right here?  would that seem to be a circle?

A.      Yes, that is a circle.

Q.      And do you see a stripe anywhere on this car?

A.      I don't see a stripe.  I see a black, I guess, molding.

Q.      Okay.  And it's on the whole length of the car; it's not just on the door like you said the car that you saw it was a two door coupe and had a stripe just on the door.

A.      It got a stop right here by the wheels.

Q.      Okay, but then it's behind the wheels too, right?

A.      That's correct.

Q.      And it's in front of the wheels too, right?

A.      I can't see.  It's in the middle section of the car.

Q.      It's in the middle section of the car but it's the length of the entire car, not just the door, correct?

A.      That's incorrect.  It's not the length of the entire car 'cause it stops there.

15

Q.      It stops at about what, 4 or 5 inches before the wheels, but it goes all the way to the back panel, doesn't it?

A.      It does.

In deferring to the ruling of the trial court, and based on the record evidence, Beals has not shown that the trial court's determination was contrary to, or involved an unreasonable application of, clearly established federal law, or that the trial court rendered a decision based on an unreasonable determination of the facts in light of the evidence presented. Wilson did not see the car and the record evidence indicates that the discrepancies between Meyers' initial description of the car (including his description of the car to Wilson) and Meyers' subsequent trial testimony were highlighted by counsel. As such, Beals has not shown that the trial court erred in finding that his counsel's performance on this issue was reasonable, and this claim by Beals should be denied.

### c. Claim Three: Ineffective Assistance of Counsel in Failing to Challenge Officer's Testimony with Statement of Paula Benoit[84]

Finally, Beals argues that his trial counsel was ineffective in failing to introduce the transcribed statement of Paula Benoit in rebuttal to testimony given by Det. Sullivan. As alleged by Beals, Det. Sullivan "testified that Mr. Beals was in possession of this incriminating information on January 16, 2013" and that "[h]er testimony alleged that Mr. Beals could have only come by this information if he were present during the homicide."[85] The testimony to which Beals is referring is a statement by Beals that "[i]f I would have killed Budda I would have shot him in broad daylight from a distance" and "I would have not walked up on him from the back and shot him."[86] According to Beals, "[h]ad counsel been familiar with the transcribed statements of witnesses; he could simply have contradicted this evidence with Paula Benoit's recorded statement

---

[84] R. Doc. 1-2, pp. 18-23.
[85] *Id.*, p. 18.
[86] *Id.*; R. Doc. 11-3, p. 25. "Budda" is a nickname for the victim, Gerald Wilkins.

to Det. Sullivan."[87]  Per Beals, Benoit, in a recorded statement made to Det. Sullivan, stated that a man named Warren Lee had called her "and told her that Budda had been found on the side of the road with bullet holes in the back of his head."[88]  Beals argues this indicates that the details of Wilkins' death had been made public at least two days before Beals's interview with Det. Sullivan, during which he made the incriminating statements.[89]

In denying this claim, the trial court noted that counsel for Beals cross-examined Det. Sullivan "on information of the shooting being provided prior to the interview with Beals" and that Beals's counsel had received the interview with Paula Benoit "and was able to review [it] prior to the trial in this matter."[90]  The trial court also again notes that another witness provided information that Beals previously made inculpatory statements, implicating himself in the murder of Gerald Wilkins.[91]  The trial court continues[92]:

> There is no reason to believe that Detective Sullivan lied or that she could have been impeached on this statement as she testified that she never told Mr. Beals how the victim was killed, not that no one in the community knew how the victim was killed.  Also, there are other various reasons that counsel for Mr. Beals may not have called Ms. Benoit to testify at trial such as the strength of her possible testimony and any extra value it may add or detract from Mr. Beals' case.  Furthermore, even if this would have prejudiced Mr. Beals, there is no indication that had counsel for Mr. Beals brought up the statements made by Ms. Benoit that there would be a substantial likelihood of a different result at trial as it was clear from the testimony of Detective Sullivan that she never discussed the method in which the victim was killed.  Furthermore, the reference to this statement could have opened Ms. Benoit to questioning by the State and could have resulted in possible negative consequences to Mr. Beals' defense.

As recognized by Beals in his Petition, his counsel "was aware of the need to challenge Det. Sullivan's inferences as can be evidenced by his cross-examination."[93]  During cross-

---

[87] R. Doc. 1-2, p. 20.
[88] *Id.*, p. 19.
[89] *Id.*
[90] R. Doc. 1-3, p. 11.
[91] *Id.*
[92] *Id.*
[93] R. Doc. 1-2, p. 19.

examination, Beals's counsel challenged Det. Sullivan, eliciting, among other things, that four days had passed between the murder of Wilkins and her interview with Beals, at which time he made the incriminating statement at issue.[94] Defense counsel also referenced in his closing argument that the information about the manner of Wilkins' death was published in the newspaper on January 14[95]--two days before Beals gave the incriminating statement.

Moreover, no one argues, and there is no indication in the record, that Beals's counsel did not receive a copy of the recorded statement of Paula Benoit. Beals confirms this in his Petition, stating "[w]hether counsel was provided with Ms. Benoit's statement was not the issue as Mr. Beals' [sic] did not raise a *Brady* claim on nondisclosure," and, even more clearly, "Mr. Beals admits that counsel was provided Paula Benoit's statement prior to trial and could have used the information contained therein."[96] As there is no question that Beals's trial counsel received a copy of Paula Benoit's statement prior to trial, it is not unreasonable to interpret counsel's decision not to use the statement as part of his trial strategy, not as ineffective assistance. Further, as noted by Respondents, Paula Benoit's statement only indicates that she knew Wilkins had been shot in the back of the head.[97] It does not show that Paula Benoit knew that Wilkins had been shot at close range, in the dark, as was suggested by Beals in his statement to Det. Sullivan.

Given the record evidence, Beals has not shown that the decision by the trial court to reject his claim that counsel's performance was deficient for failing to impeach Det. Sullivan with Paula Benoit's statement was contrary to, or involved an unreasonable application of, clearly established federal law, or was an unreasonable determination of the facts in light of the evidence presented. As such, this claim by Beals should also be denied.

---

[94] *Id.*; R. Doc. 11-3, p. 42.
[95] R. Doc. 11-3, p. 242.
[96] R. Doc. 1-2, pp. 21, 22.
[97] R. Doc. 10, p. 10.

###### d.     Petitioner Has Failed to Demonstrate Actual Prejudice

As Beals has not shown that the trial court erred in finding that his counsel's performance fell within an acceptable standard, Beals has failed to demonstrate ineffective assistance of counsel.  In an abundance of caution, however, the Court will also address the second prong of *Strickland*, which requires a petitioner to affirmatively prove actual prejudice, meaning he must demonstrate that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different.[98]  As noted by the trial court, "there was testimony provided by another witness who stated that Mr. Beals made inculpatory statements regarding the murder."[99] There was also other evidence adduced at trial to support Beals's conviction.

First, there is a video from the Speedy Junction in Sorrento, Louisiana, located 1.4 miles from the crime scene, showing Beals entering the store at 3:38 a.m. the morning of Wilkins' death, which is estimated to have occurred between 3:30 and 4:00 a.m. based on Meyers' testimony.[100] The video also shows a car "consistent" with Jones's vehicle at Speedy Junction with Beals, containing a passenger in the back seat, who can be seen, and a driver, who cannot be seen; Beals was not in the vehicle when the vehicle appeared on the Speedy Junction camera.[101]  Upon being shown still-shot photographs by Detective David Baldwin, an investigator with the Ascension Parish Sheriff's Office, from the video taken from Speedy Junction, Beals identified both himself and Jones's vehicle from the video.[102]

In addition to evidence placing Beals near the scene of the crime at or about the time the crime was committed, Jeremiah Billingsley ("Billingsley"), who was in the Ascension Parish jail

---

[98] *Id.* at *3, citing *Strickland*, 466 U.S. at 694.
[99] R. Doc. 11-3, p. 9.
[100] R. Doc. 11-2, pp. 70, 77, 80, 119-120; R. Doc. 11-1, p. 238.
[101] R. Doc. 11-2, pp. 80-81.
[102] R. Doc. 11-3, p. 68.

with Beals, testified that Beals told him about the death of Wilkins, saying that "three people left and two people came back."[103]  Billingsley further testified that Beals said "[t]hat they went down some road down in Sorrento by a bayou or some – or a boat landing and the guy said he had to use the bathroom to urinate, and when he got out of the car that's when he was taken care of."[104]  As testified by Billingsley, "I was told he was shot in the head or shot in the back or something like that," but that "the weapon would never be found."[105]

Given this evidence, as well as the other testimony and evidence introduced at trial, the trial record shows sufficient other evidence of Beals's guilt, such that Beals cannot establish prejudice in trial counsel's decisions not to call Tony Wilson as a witness, not to introduce the statement of Paula Benoit, or not to investigate the daytime running lights of Jones's vehicle.  Here, Beals has failed to show that the trial court's determination that his trial counsel's actions fell within an acceptable level and/or that Beals did not suffer any prejudice for any alleged deficient conduct was an unreasonable application of federal law or an unreasonable determination of the facts in this case.  As such, his Petition must be denied.

### C.  A Certificate of Appealability Should be Denied

Should Beals pursue an appeal, a certificate of appealability should be denied. An appeal may not be taken to the court of appeals from a final order in a habeas corpus proceeding "unless a circuit justice or judge issues a certificate of appealability."[106]  Although Beals has not yet filed a Notice of Appeal, the Court may address whether he would be entitled to a certificate of

---

[103] *Id.*, p. 114.
[104] *Id.*, p. 115.
[105] *Id.*, pp. 115, 116.
[106] 28 U.S.C. § 2253(c)(1)(A).

appealability.[107]  A certificate of appealability may issue only if a habeas petitioner has made a substantial showing of the denial of a constitutional right.[108]

In cases where the Court has rejected a petitioner's constitutional claims on substantive grounds, a petitioner must demonstrate that "jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."[109]  Reasonable jurists would not debate the denial of Beals's Petition or the correctness of the substantive rulings. Accordingly, it is appropriate that, if Beals seeks to pursue an appeal in this case, a certificate of appealability should be denied.

## III.    RECOMMENDATION

**IT IS RECOMMENDED** that Petition for Relief from a Conviction or Sentence By a Person in State Custody (Petition Under 28 U.S.C. § 2254 for a Writ of Habeas Corpus),[110] filed by Petitioner Cecil Beals, be **DENIED** and **DISMISSED WITH PREJUDICE.**

**IT IS FURTHER RECOMMENDED** that a certificate of appealability be **DENIED** if Petitioner seeks to pursue an appeal.

Signed in Baton Rouge, Louisiana, on July 27, 2023.



**ERIN WILDER-DOOMES**
**UNITED STATES MAGISTRATE JUDGE**

---

[107] *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000).
[108] 28 U.S.C. § 2253(c)(2).
[109] *Pippin v. Dretke*, 434 F.3d 782, 787 (5th Cir. 2005), quoting *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).
[110] R. Doc. 1.